# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| DAVE COLLIER, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>       v.<br><br>ALTIMMUNE, INC., VIPIN K. GARG, and MATTHEW SCOTT HARRIS,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Dave Collier ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Altimmune, Inc. ("Altimmune" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Altimmune's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Altimmune securities between August 10, 2023 and June 25, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      The alleged misrepresentations in this case focus on Altimmune's failure to achieve statistical significance in its analysis of the fibrosis reduction primary endpoint in its IMPACT Phase 2b MASH trial. In pertinent part, Defendants provided the public with overwhelmingly positive statements leading up to the announcement of topline results that failed to account for the fibrosis reduction observed in the placebo group.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, misrepresenting and/or concealing material adverse facts concerning the true state of the results observed in Altimmune's IMPACT Phase 2b MASH trial. Altimmune's executives repeatedly touted their positive expectations and even went as far as to title the press release announcing IMPACT Phase 2b MASH trial topline results "Announces Positive Topline Results from the IMPACT Phase 2b MASH trial of Pemvidutide in the Treatment of MASH," completely disregarding that one of two primary endpoints was not found to be statistically significant.  In fact, Defendants spent minimal time discussing the aforementioned failure during the Special Call hosted by Altimmune pertaining to the topline results, rather stating that the Company hoped for better results in the Phase 3 trial.

4.      On June 26, 2025, Altimmune published a press release announcing topline results from the IMPACT Phase 2b MASH trial of Pemvidutide in the Treatment of MASH. While Defendants had continuously provided inflated expectations ahead of these results, the analysis

showed a pointed failure by the Company to achieve statistical significance in its analysis of the fibrosis reduction primary endpoint in its IMPACT Phase 2b MASH trial. In particular, while a positive trend in fibrosis improvement was observed, statistical significance was not met due to a higher-than-expected placebo response. When questioned about this concerning miss, Defendants answered indifferently, attributing this result to the Phase 2 nature of the trial and stated that Altimmune was hoping for better results following the Phase 3 trial.

5.     Investors and analysts reacted immediately to Altimmune's revelation. The price of Altimmune's common stock declined dramatically. From a closing market price of $7.71 per share on June 25, 2025, Altimmune's stock price fell to $3.61 per share on June 26, 2025, a decline of 53.2% in the span of just a single day. Investors who purchased Altimmune stock prior to this disclosure did so based on materially misleading information and suffered damages as a result.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendant Altimmune's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.    Plaintiff purchased Altimmune common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Altimmune is attached hereto.

12.    Altimmune, Inc. is a Delaware corporation with its principal executive offices located at 910 Clopper Road, Suite 201S, Gaithersburg, Maryland 20878. During the Class Period, the Company's common stock traded on the Nasdaq Stock Exchange (the "NASDAQ") under the symbol "ALT."

13.    Defendant Vipin K. Garg ("Garg") was, at all relevant times, the Chief Executive Officer, President, and Director of Altimmune.

14.    Defendant Matthew Scott Harris ("Harris") was, at all relevant times, the Chief Medical Officer of Altimmune.

15.    Defendants Garg and Harris are sometimes referred to herein as the "Individual Defendants." Altimmune together with the Individual Defendants are referred to herein as the "Defendants."

16.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Altimmune's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports

and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.    Altimmune is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Altimmune under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

19.    **Altimmune** is a clinical stage biopharmaceutical company focused on developing treatments for obesity, metabolic and liver diseases. The Company's lead product candidate, pemvidutide (formerly known as ALT-801), is a novel, investigational, peptide-based GLP-1/glucagon dual receptor agonist. Pemvidutide is currently in clinical development for obesity and metabolic associated steatohepatitis ("MASH").

***The Defendants Materially Misled Investors Concerning***

***Altimmune's IMPACT Phase 2b Trial***

<u>*August 10, 2023*</u>

20.    On August 10, 2023, Altimmune announced second quarter 2023 financial results and provided a business update. Defendant Garg stated, in pertinent part:

> We are pleased to have commenced enrollment in our IMPACT Phase 2b biopsy-driven trial of pemvidutide in NASH," said Vipin K. Garg, Ph.D., President and Chief Executive Officer of Altimmune. We believe our compelling Phase 1b data in subjects with nonalcoholic fatty liver disease (NAFLD) demonstrating class-leading improvements in liver fat and markers of liver inflammation support the prospects of achieving robust rates of NASH resolution and fibrosis improvement in our IMPACT trial. We are also eager to report our 48-week data from the MOMENTUM Phase 2 obesity trial next quarter. We believe the pemvidutide data showing significant weight loss, combined with robust reductions in liver fat content, serum lipids and blood pressure without cardiovascular safety signals could offer a differentiated product profile that meaningfully impacts patients with obesity and NAFLD or dyslipidemia, and patients with NASH.

21.    As part of the Company's second quarter financial results release, Altimmune included information pertaining to the commencement of the IMPACT Phase 2b NASH trial, stating, in relevant part:

> *Commenced enrollment in IMPACT Phase 2b NASH trial*
>
> o    This Phase 2b biopsy-driven NASH trial is being conducted at approximately 60 sites in the U.S., with Dr. Stephen Harrison, Medical Director, Pinnacle Research, and Adjunct Professor of Medicine, Oxford University, serving as the principal investigator.
> o    Approximately 190 subjects with and without diabetes are planned to be randomized 1:2:2 to 1.2 mg, 1.8 mg pemvidutide or placebo.
> o    The key endpoints will be NASH resolution and fibrosis improvement after 24 weeks of treatment, with subjects followed for an additional 24 weeks for assessment of safety and additional biomarker responses.
> o    Top-line results after 24 weeks of treatment are expected in the first quarter of 2025.

<u>*November 7, 2023*</u>

22.    On November 7, 2023, Altimmune announced third quarter 2023 financial results and provided a business update pertaining to its IMPACT Phase 2b NASH trial. In pertinent part:

*Enrollment commenced in IMPACT Phase 2b NASH trial*

o    Informed by the positive results of the Phase 1b randomized, placebo-controlled trials of pemvidutide in subjects with non-alcoholic fatty liver disease (NAFLD), the FDA granted pemvidutide Fast Track designation for the treatment of NASH.

o    This Phase 2b biopsy-driven NASH trial is being conducted at approximately 60 sites in the U.S., with Dr. Stephen Harrison, Medical Director, Pinnacle Research, and Adjunct Professor of Medicine, Oxford University, serving as the principal investigator.

o    Approximately 190 subjects with and without diabetes are planned to be randomized 1:2:2 to 1.2 mg, 1.8 mg pemvidutide or placebo.

o    The key endpoints will be NASH resolution and fibrosis improvement after 24 weeks of treatment, with subjects followed for an additional 24 weeks for assessment of safety and additional biomarker responses.

o    Top-line results after 24 weeks of treatment are expected in the first quarter of 2025.

<u>*March 27, 2024*</u>

23.    On March 27, 2024, Altimmune announced fourth quarter and full year 2023 financial results and a business update pertaining to its IMPACT Phase 2b MASH trial. Defendant Garg stated, in relevant part:

We also remain excited about the outcome of our ongoing IMPACT Phase 2b MASH trial with topline 24-week data on the key endpoints of MASH resolution or fibrosis improvement anticipated in the first quarter of 2025. The results from a recently completed preclinical study demonstrating direct anti-fibrotic activity of

pemvidutide only adds to our optimism about achieving a positive outcome in this trial.

24.     Later the same day, Altimmune hosted an earnings call detailing updates pertaining

to the IMPACT Phase 2b MASH trial. In particular, Defendant Garg stated, in relevant part:

> Turning to our Impact biopsy-driven Phase IIb MASH trial, we are looking forward to announcing the top line 24-week results anticipated in the first quarter of 2025. ***We are confident this trial will be successful considering the positive results from our 24-week Phase Ib trial of pemvidutide in subjects with NAFLD, where a greater than 75% relative reduction in liver fat content was achieved at the 1.8 milligram and 2.4 milligram dosage at 24 weeks, along with robust reductions in ALT and cT1, both biomarkers of liver inflammation. A recently completed preclinical study demonstrating a direct anti-fibrotic activity of pemvidutide provides evidence of the potential second mechanism for reducing fibrosis in MASH patients.***

[Emphasis added].

### *August 8, 2024*

25.     On August 8, 2024, Altimmune published second quarter 2024 financial results and

provided a business update pertaining to its IMPACT Phase 2b NASH trial. Defendant Garg stated,

in pertinent part:

> During the second quarter, we continued to highlight the scientific evidence supporting the robust therapeutic potential of pemvidutide in metabolic diseases. ***The data presented at the European Association for the Study of the Liver (EASL) meeting highlighted the disease-modifying potential of pemvidutide in MASH and reinforces our confidence in achieving success on the MASH resolution and fibrosis improvement endpoints of our Phase 2b IMPACT trial.*** We also delivered two podium presentations at the American Diabetes Association (ADA) 84th Scientific Sessions that highlighted the robust reductions in body weight and serum lipids with pemvidutide treatment. In addition, we presented data demonstrating class-leading preservation of lean mass among incretin agents, an increasingly important consideration in the treatment of obesity. These data further exemplify the differentiation and broad utility we believe pemvidutide will bring to the rapidly evolving obesity marketplace. We continue to make progress toward expanding the development of pemvidutide in up to three additional indications where its dual GLP-1/glucagon agonism could provide benefit over currently available agents. In parallel with these efforts, our discussions with potential strategic partners continue to progress. We look forward to sharing further updates on each of these initiatives.

[Emphasis added].

26.     The same day, Altimmune hosted an earnings call detailing second quarter 2024 financial results. Defendant Harris stated, in relevant part:

> Turning to MASH. ***We presented data at the EASL Congress from a quantitative model that would predict a high likelihood of success in the upcoming IMPACT trial.*** In addition, an analysis of data in our Phase 1 trial of metabolic-associated steatotic liver disease, also known as MASLD, demonstrated that higher proportions of subjects receiving pemvidutide achieved improvements in FibroScan-aspartate aminotransferase or FAST score, MRI-PDFF and alanine aminotransferase compared with subjects receiving placebo. ***This suggests that significant rates of mass resolution and fibrosis improvement may be achieved in the IMPACT Phase 2b MASH trial.*** We also presented data on the ability of pemvidutide the lower serum lipid species associated with dyslipidemia in MASH, which reminds us that cardiovascular benefits of the primary cause of mortality in match patients.
>
> In addition, we recently published our results from the 12-week trial of pemvidutide in MASLD, metabolic associated liver disease in the Journal of Hepatology, establishing the differentiated effects of pemvidutide in the treatment of MASLD and MASH. The safety and tolerability profile of pemvidutide was highlighted by the low 2.9% rate of adverse event discontinuations in this trial. With respect to impact, our enrollment is progressing well. If the 24-week efficacy endpoints are achieved, we believe the results could be transformative for the MASH therapeutic space as we would demonstrate for the first time with rapid improvement in mass resolution and fibrosis improvement with an incretin agent in a 24-week time frame.

[Emphasis added].

*November 12, 2024*

27.     On November 12, 2024, Altimmune announced third quarter 2024 financial results and provided a business update. Defendant Garg stated, in pertinent part:

> In the third quarter, we reached several important milestones, most notably the completion of enrollment in the Phase 2b IMPACT trial of pemvidutide in MASH, positioning us to report top-line efficacy data in the second quarter of 2025.Further, we successfully completed our End-of-Phase 2 meeting with the FDA for the pemvidutide Phase 3 obesity program, gaining agreement on the design of the pivotal studies as well as the measures of efficacy and safety.

28.     Later the same day, Altimmune hosted an earnings call detailing updates pertaining to the IMPACT Phase 2b MASH trial. Particularly, Defendant Garg stated in pertinent part:

> Upon a positive data readout from Phase IIb IMPACT trial in the second quarter of 2025, we expect to be ready to start a Phase III program in MASH by the end of next year. We continue to believe that pemvidutide is a highly differentiated agent from others and in strategically important ways, relative to the current metabolic disease landscape.

### *February 27, 2025*

29.     On February 27, 2025, Altimmune announced fourth quarter and full year 2024 financial results and provided a business update. Defendant Garg stated, in relevant part:

> 2024 was a year of important progress for Altimmune as we continued to advance pemvidutide in multiple indications. As announced previously, we completed enrollment of the IMPACT Phase 2b trial of pemvidutide in MASH and are on track to report top-line data in the second quarter of 2025. IMPACT was one of the fastest enrolling biopsy-driven Phase 2b MASH trials, which we believe reflects the attractiveness of pemvidutide to patients and providers, specifically the compound's potent reduction of both liver fat and body weight. Based on the totality of the data generated to date, including multiple non-invasive biomarkers of liver inflammation and fibrosis, we are confident that pemvidutide will achieve statistically significant improvements in biopsy endpoints, both MASH resolution and fibrosis improvement, at trial readout. We anticipate holding an end-of-Phase 2 meeting with FDA by the end of 2025 to gain alignment on the registrational Phase 3 program.

### *May 13, 2025*

30.     On May 13, 2025, Altimmune announced first quarter 2024 fiscal results and provided a business update pertaining to its IMPACT Phase 2b MASH trial. The press release stated, in pertinent part:

> *Top-line data from the IMPACT Phase 2b trial of pemvidutide in biopsy-confirmed F2/F3 MASH expected in Q2 2025*
> o       Top-line data is expected to include rates of MASH resolution and fibrosis improvement, weight loss, non-invasive tests, and data on safety and tolerability.
> o       A total of 212 participants were randomized, exceeding the 190 originally planned.

o    If successful, pemvidutide would be the first investigational therapy in MASH to achieve statistical significance in both MASH resolution and fibrosis improvement, as well as demonstrate meaningful weight loss, after only 24 weeks of treatment.

31.    The above statements in Paragraphs 20 to 30 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the results of the Company's IMPACT Phase 2b MASH trial. In truth, Altimmune failed to meet an important statistical significance marker relating to the fibrosis reduction primary endpoint. The Company had consistently touted its inflated expectations for positive topline results from the IMPACT Phase 2b MASH trial, while concealing higher responses in the placebo group, which they knew or should have known would negative impact the topline results. Altimmune's IMPACT Phase 2b MASH trial results fell short of reality, as shown by the Company's topline data, which show that the statistical significance was not achieved for the fibrosis reduction primary endpoint.

### *The Truth Emerges*

<u>*June 26, 2025*</u>

32.    On June 26, 2025, Altimmune published a press release announcing topline results from the IMPACT Phase 2b Trial of Pemvidutide in the Treatment of MASH, in pertinent part:

**Highlights from the 24-week Topline Results**

- In an ITT analysis, MASH resolution without worsening of fibrosis was achieved in 59.1% and 52.1% of participants treated with pemvidutide 1.2 mg and 1.8 mg, respectively, vs. 19.1% of participants treated with placebo (p< 0.0001, both doses).
- In an additional ITT analysis, fibrosis improvement without worsening of MASH was achieved in 31.8% and 34.5% of participants treated with pemvidutide 1.2 mg and 1.8 mg vs. 25.9% of participants treated with placebo (differences not significant).
- A supplemental AI-based analysis demonstrated statistically significant reductions in fibrosis, which included 30.6% of participants receiving pemvidutide 1.8 mg achieving a 60% or more reduction in fibrosis compared to 8.2% receiving placebo (p< 0.001).

- Pemvidutide-treated participants also achieved statistically significant reductions in non-invasive tests of fibrosis (ELF and VCTE) and inflammation (alanine aminotransferase, ALT).

- A total of 25.8% and 24.1% of participants receiving pemvidutide 1.2 mg and 1.8 mg, respectively, achieved the stringent endpoint of MASH resolution and fibrosis improvement versus 13.5% in participants receiving placebo (differences not significant).
- Participants receiving pemvidutide 1.2 mg and 1.8 mg achieved weight loss of 5.0% and 6.2% vs. 1.0% in placebo (p< 0.001), with the trajectory showing no plateauing at 24 weeks.
- Liver fat reductions of 58.0% and 62.8% were achieved in participants who received pemvidutide 1.2 mg and 1.8 mg, respectively, vs. 16.2% in participants who received placebo (p< 0.001, both doses).
- AEs leading to treatment discontinuation were 0.0% and 1.2% for pemvidutide 1.2 mg and 1.8 mg, respectively, vs. 2.4% in participants on placebo.
- No SAEs related to study drug or arrhythmias were reported at 24 weeks.
- Glycemic control was maintained with minimal changes in HbA1C regardless of diabetic status

33.    Later the same day, Altimmune hosted a Special Call detailing the topline results from the IMPACT Phase 2b Trial of Pemvidutide in the Treatment of MASH. Defendant Harris provided the following analysis pertaining to the results, in relevant part:

*The next slide shows the fibrosis improvement data based on pathologist reads using the ITT method. Although we saw positive trends in fibrosis improvement, statistical significance was not achieved on this endpoint.* We'll dig into this further on the next slide.

On the next slide, we compare these fibrosis improvement rates to other studies. The 34.5% absolute fibrosis improvement observed for pemvidutide at 1.8 milligrams was similar to other candidates, *but the achievement of statistical significance was impaired by the higher-than-expected placebo response. The magnitude of the treatment effect on a placebo-adjusted basis was not dissimilar to that observed with other compounds. Based on the additional analysis that I'm about to show you, it is our believe that these effects, which were observed at only 24 weeks of treatment have the potential to amplify over time and that statistical significance could potentially have been achieved at week 48.*

\*      \*      \*

The next slide shows the composite endpoint of patients achieving both MASH resolution and fibrosis improvement. As shown, when more stringent endpoints are employed, the placebo response, which appeared are achieving statistical significance on the fibrosis improvement endpoint was minimized. In fact, in this analysis, the pemvidutide response was almost twice that observed with placebo and approached statistical significance with a P value of 0.07 at the 1.8 milligram dose. *It is important to note that resmetirom and semaglutide, 2 drugs that are either approved or on the verge of approval for MASH, failed to meet statistical significance on the fibrosis improvement endpoint in Phase II trials, but met them in Phase III.*

*In the case of resmetirom, success was achieved by extending the duration of treatment from 36 to 48 weeks, allowing the fibrosis improvement response further time to develop. And in the case of semaglutide by the reduction of the placebo response inherent when large number of subjects are studied as when Phase III studies are conducted.*

[Emphasis added].

34.    During a question-and-answer segment of the Special Call, analysts probed Defendants regarding the IMPACT Phase 2b MASH trial results, in pertinent part:

> <Q: Emma Nesson - Piper Sandler & Co. – Research Analyst> This is Emma, on for Yas. I guess we're wondering that beyond the larger size in a Phase III and duration, what are some things you can do to mitigate the placebo response in the Phase III? And do you think that there is an opportunity for the regulatory like landscape to shift towards maybe accepting AI-based histological analyses?
>
> <A: Defendant Harris> Thanks, Emma. Well, obviously, we have one very successful strategy here, which is the placebo response will go down in Phase III. We're also looking for additional methods to control the placebo response given the biopsy reads. Obviously, more stringent endpoints like the one that was shown in the presentation will also improve the treatment effect.

35.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the above-referenced press releases. On those calls, Defendants repeatedly touted the Company's positive expectations for topline results from its IMPACT Phase 2b MASH trial. In truth, Altimmune failed to account for high placebo responses during the study leading the critical miss of the fibrosis reduction primary

endpoint. Furthermore, when directly asked about this failure to reach statistical significance, Defendants' response was less than reassuring; particularly, that Altimmune was hoping to reach the statistical significance target during the Phase 3 trial.

36.    Investors and analysts reacted immediately to Altimmune's revelation. The price of Altimmune's common stock declined dramatically. From a closing market price of $7.71 per share on June 25, 2025, Altimmune's stock price fell to $3.61 per share on June 26, 2025, a decline of 53.2% in the span of just a single day.

37.    A number of well-known analysts who had been following Altimmune issued negative ratings for the Company. For example, Evercore ISI, as part of a report titled "Not the Monster MASH investors were looking for as high PBO rate clouds signal," stated, in pertinent part:

> Altimmune reported MASH biopsy data from the P2b IMPACT study for pemvidutide, showing 9% reduction in fibrosis at 6 months, net of the high placebo rate of 26%, not statistically significant, p-value not disclosed. A slower response than FGF21's but perhaps not inconsistent with other MOAs/drugs including Rezdiffra, semaglutide and survodutide (which was the same MOA). MASH resolution rate of 33% at the higher dose (40% at the low dose) net of placebo was statistically significant & sandwiched between FGF ETNB's pegozafermin and AKRO's efruxifermin, a decent outcome. Weight loss reached the high end of our expectations coming in at 5.2% net of placebo, at the higher dose with no signs of plateauing. Low single digit discontinuation rate suggests good tolerability. Importantly safety continues to look good with no material increase in heart rate, an AE of special interest for glucagon containing medicines like pemvidutide.

38.    Additionally, William Blair called the results "underwhelming" and provided less-than-positive analysis, in relevant part:

> Overall, given the lack of fibrosis improvement at the 24-week primary endpoint and the limited ability, in our view, to demonstrate stringent fibrosis improvement at the 48-week time point (no liver biopsy will be conducted), we believe the results are underwhelming. In addition, we view the weight loss magnitude at 24 weeks as non-differentiating. We therefore reiterate our Market Perform rating, and we provide more detailed thoughts in the note below.

\*      \*      \*

While the Phase IIb IMPACT study met the MASH resolution endpoint, we believe investors are considerably more interested in the other primary endpoint of fibrosis improvement, which has been demonstrated to correlate with reduced progression to cirrhosis, liver failure, development of hepatocellular carcinoma, and mortality.

39.    The fact that these analysts, and others, discussed Altimmune's IMPACT Phase 2b MASH trial's failure to meet one of its primary endpoints suggests the public placed significant weight on Altimmune's prior positive statements surrounding the trial and its expected results. The frequent, in-depth discussion of Altimmune's guidance confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

40.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Altimmune's common stock and operated as a fraud or deceit on Class Period purchasers of Altimmune's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Altimmune's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Altimmune's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

41.    Altimmune's stock price fell in response to the corrective event on June 26, 2025, as alleged *supra*. On June 26, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Altimmune's IMPACT Phase 2b MASH trial results.

42.     In particular, on June 26, 2025, Altimmune announced that the IMPACT Phase 2b MASH trial failed to meet one of its primary endpoints. In particular, the results shows that statistical significance was not achieved for the fibrosis reduction primary endpoint because the placebo response was higher than expected.

### Presumption of Reliance; Fraud-On-The-Market

43.     At all relevant times, the market for Altimmune's common stock was an efficient market for the following reasons, among others:

(a)     Altimmune's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Altimmune communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Altimmune was followed by several securities analysts employed by major brokerage firms who authored reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Altimmune was reflected in and incorporated into the Company's stock price during the Class Period.

44.     As a result of the foregoing, the market for Altimmune's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Altimmune's stock price. Under these circumstances, all purchasers of Altimmune's common stock during the Class Period suffered similar injury through their

purchase of Altimmune's common stock at artificially inflated prices, and a presumption of reliance applies.

45.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

46.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with inflated expectations pertaining to the results of the IMPACT Phase 2b MASH trial. Defendants consistently provided the public with overstated outlooks  for  the  control  group's success in the trial that failed to account for the changes observed in the placebo group.

47.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

48.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was

authorized and/or approved by an executive officer of Altimmune who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Altimmune's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Altimmune's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Altimmune or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 9, 2025, there were 81.1 million shares of the Company's

common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Altimmune;

(c)     whether the Individual Defendants caused Altimmune to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Altimmune's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54.       A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

55.       Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.       This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.       During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Altimmune common

stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Altimmune's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

58.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Altimmune's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

59.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

60.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Altimmune's internal affairs.

61.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Altimmune's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Altimmune's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Altimmune's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

62.     During the Class Period, Altimmune's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Altimmune's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Altimmune's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Altimmune's

common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

63.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

65.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Altimmune's misstatements.

67.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Altimmune which had become materially false or misleading.

68.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Altimmune disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Altimmune to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Altimmune's common stock.

69.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Altimmune to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

70.     By reason of the above conduct, the Individual Defendants and/or Altimmune are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 5, 2025                                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Jordan Cafritz*
Jordan Cafritz (#20908)
1101 Vermont Avenue,
NW Suite 800
Washington, DC 20005
Tel.: (202) 524-4290
Fax: (212) 363-7171
Email: jcafritz@zlk.com

-and-

Adam M. Apton (*pro hac vice forthcoming*)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*